Good morning. I guess it's a very early good morning to Council in Guam. We'll now hear an argument in United States v. Ling, and I guess we hear from Ms. Johnson first. I'm not used to going first. I'm not quite sure how to proceed. I want to thank you for allowing us to have the video conference as we are. I must say I think it looks very, very good, and I can certainly see the court very well. We're still in trial on the district court case, and so I would have had to fly back immediately after this argument had we had it in Honolulu. So thank you very much for doing this. The basis of this case, of course, is a government appeal from the court granting a judgment of acquittal after the jury had returned a guilty verdict on count two. Our position is that there was sufficient evidence to support the jury's verdict, that any rational trier of fact could indeed have found the defendant guilty based on the evidence that was presented, and that the court, in effect, substituted its judgment for that of the jury. The facts were generally not in dispute, and the credibility of the witnesses were not in dispute. A defendant had attempted to enter Guam in 2003, and she was caught. The garment factories are closing in Saipan. We have thousands of Chinese up there, and they're out of work, and they don't want to go home. She was caught attempting to enter Guam, brought back to Saipan with a CNMI, charged with an attempt to illegally enter the United States, and was released on her own recognizance. And she probably paid another smuggler to bring her to Guam and landed at the Manila Golf Course in February of 2004. She was arrested. Judge Munson in Saipan issued a warrant for her arrest for violating her terms of release, and two procedures happened, two parallel procedures. One is that she was interviewed by Customs and Border Protection Officer Tom Morgan. The purpose of that was to establish a credible fear. It had nothing to do with the criminal charges in Saipan or the warrant that Judge Munson had issued. It was purely what they call a credible fear determination. At the same time, pursuant to Judge Munson's warrant, she was brought into the district court and ultimately returned to Saipan, where she was recharged with a more serious indictment, and the people who had been on the boat with her, and pled guilty to illegal entry, a subsequent offense. That was her 2004 conviction. She was put on a year of supervised release. At the end of that supervised release, 13 days after it had expired, when she could be assured that Judge Munson would not bring her back again, she paid a third smuggler and successfully made it into Guam, landing at Virginia Point, which is up north, and disappeared into the underground Chinese economy here. Within two weeks of landing, she filed an asylum application. In 2004, when she had been interviewed on this parallel proceeding by Tom Morgan, she had indicated that she wanted to come to the United States to work, and when he asked, well, is there some credible fear of returning to China, she said, well, I am expected to marry if I go back to China, and I might get pregnant, and then I might be forced to have an abortion, which is to say, not a basis for a credible fear. By the time she came back to Guam in 2005, she had a better story. Nothing about coming here to work, because of course that would not be a basis for asylum, and in her application for asylum, she details this gruesome abortion at six months where she almost dies. Definitely a basis for asylum, if in fact it is true. The allegations of false statement arose out of the first page of the asylum application, where she is required to report the dates that she has entered the United States. She reported the 2003 date, which in fact was only an attempted entry, it was not technically an entry, and she reported the 2005 where she had filed the asylum application. She omitted the 2004 entry. The government's position was that she deliberately omitted the 2004 in an attempt to avoid the asylum officer learning about the interview that she had with Tom Morgan, because that interview would obviate the basis for her asylum application, or certainly throw it into question. Then that became the issue, whether the 2003 was a typographical error, whether it should be 2004, as counsel argued, or whether in fact it was a deliberate and intentional misstatement. The evidence in support of that was the fact that she reported a criminal conviction, but when asked to expand on it, she did not, and did not say anything about the criminal conviction, the date that it was entered, or the time, or what had occurred. It was, as I say, the facts were not in dispute, the credibility of the witnesses was not in dispute, so it's unlike many trials where the jury has to make such a determination. In fact, it was a question of the reasonable inferences that one could draw from this evidence, and counsel and I both agreed that it was a closed issue. She was charged with two counts. The second count, a false statement, was the 2003-2005 entry. The third was lying in her application about the abortion. The jury, this being a very strong Catholic community, came back not guilty on abortion, which counsel and I both thought were definitely the stronger count, but convicted her of count two. The question is, was there sufficient evidence for any rational finder of fact to find her guilty of count two? The same arguments that counsel made to the jury, which they rejected, he made to the district court, and the district court believed that his arguments were valid, and I believe substituted its judgment for that of the jury. So that is what this case is about, and we believe that the case law supports the court reversing the district court on this matter. You have a record of historical facts, in effect, that support conflicting inferences, and U.S. v. Von Collari, which I cite in my memorandum. Did she fill out her own form when she entered the date of her entry into the United States? Did she fill that out herself, or did her lawyer? No, and that was a point of contention, and again, a dispute as to what facts one can infer from that. She was represented by an immigration attorney, Gerald Ray, who had a professional interpreter. And so she did not fill this out herself. There's no question that she could barely speak English, and she would not have been capable of filling it out herself, certainly not accurately, but she did not have some friend helping her. She had an attorney, Gerald Ray, and a professional interpreter who assisted her in filing this asylum application. The government argued that the inference from that is that it was done properly, and that it's the attorney's job and his interpreter's job to ensure that the facts that she told them were accurately recorded. The district court judge looked at it the other way and said, well, that means that somebody else did it, and therefore there could have been a possibility of mistake. Again, two equal facts, and the jury had to decide. Well, does the beyond a reasonable doubt rule apply here on the possibility of a mistake? Well, there are two inferences that one can draw from this evidence, that it was intentional or it was a mistake. Both of those points were argued to the jury, and the jury decided that the evidence justified that it was an intentional error and not a mistake. Our position is that reasonable minds could differ on this, but that there was sufficient evidence to support the jury's finding of facts, and that is the position of our appeal. Why doesn't the government just repatriate this lady and not try to put her in jail first? Well, I don't know, Your Honor. The asylum office, frankly, is an entirely separate branch of the government. Well, I know. I mean, they don't talk to us. If someone, for example, comes into the country illegally and applies for asylum, they do not even advise the immigration field office here that that has occurred. They seem to, frankly, be very protective of the people who apply for asylum. Our criminal investigators in the immigration service here do not even know who have entered the country illegally because the asylum office does not share that information. So what they do and the decisions they make, the government seems to be deliberately split in that respect, and intentionally so. It appears that that's the way it's set up. Any other questions? I think I have 30 seconds that I would try to reserve. Thank you, Ms. Johnson. Mr. Trapp? Thank you. May it please the Court. The government says that my client did not report the 2003 entry. There was no 2003 entry. The government, I suggest, misrepresents what the count two charges. Count two charges that she subscribed that she entered the United States on only two occasions, August 2005 and February 2003, when in truth and in fact she entered also on February 27, 2004. But she did not enter. She simply did not enter in 2003. And also, she represented that she entered in February 27, 2004. She did not enter in, I mean, on February of 2003. She did not in any sense enter in February of 2003. She attempted to enter. Mr. Trapp, I may be misunderstanding. But isn't the critical thing that she did not say that she entered in 2004? I mean, that's the critical entry or failure to enter, isn't it? The government seems to think that the problem is that she said that she entered on only two occasions. No, I think the theory is that she did not say that she entered in 2004, which would have led to the Morton interview. So she declined, she simply did not say that she entered in 2004, nor does her affidavit indicate that she entered the United States in 2004. It simply skips from her arrival in Saipan on February 18, 1997 to her arrival in Guam in August of 2005. Well, I suggest that the government has argued that the number of times that she has entered the United States is material to the asylum claim. And that she knew that she had entered three times is contrary even to the evidence in the case because one of the immigration officers... No, I mean, but I'm sorry, are you just giving me your theory of their theory? Because as I understand it, the theory was that not reporting the 2004 illegal entry is the problem because that would have been material. It's confusing as to what the problem is, Your Honor. Not just my theory of their theory, but if you read the indictment, the indictment says that she subscribed, that she entered on only two occasions. The word only, of course, implies that she should have mentioned a third occasion and that she had entered in February of 2004. She wrote down that she came in on 02-2003. She missed that year by one number. And if she was trying to hide the fact that she had entered on two occasions, she said she entered on two occasions, and certainly they would check the records. I mean, to say that a reasonable jury could have found beyond a reasonable doubt that this wasn't a typographical error, I think, stretches the imagination. Well, it would have been far more persuasive from the defense position that it was a mistake if her affidavit had gone on to explain that she had in fact had a prior conviction arising out of that entry. So there were two opportunities to have told the truth, and neither did she. And so why can't the jury reasonably find beyond a reasonable doubt that it was not a mistake, but rather was an intentional failure to provide any details at all that would have disclosed the 2004 entry? Well, because if she was trying to cover up entries, why would she say that she had come in in February of 2003, went in truth and in fact, and the government's evidence shows that she simply did not? I mean, she could have just put the one entry in 2005. That would be consistent with the government's theory. To put down that she had come in two different times, that she had come in in February of 2003 or any time in 2003 when she didn't, shows that this is just a typographical error. The government suggests that she put down 2003 to hedge her bets so that in the event there was this type of case, she could make the arguments that you're making now. Why couldn't the jury reasonably conclude that that was her reason for putting down 2003? That is a sophisticated point of view if the government were to take that position. But this non-English-speaking young lady to put that down, that she figured all this out, it just stretches the imagination, Your Honor. Well, then what's your explanation for the failure to note the conviction in the affidavit despite the fact that she indicated that either she and or a family member had had a prior conviction? She doesn't, well, she had an attorney and why this wasn't worked out by the attorney and her interpreter, I cannot explain. She put down there was a conviction. If she wanted to cover up that there was a conviction... Well, her actual answer was she or her family. I understand because that was the only question that was available for her to answer. And you would think the attorney would say to her, well, okay, who had a conviction and let's put that down. This was done in such an obviously slip-shod manner and without any thought of proofreading it or going over it, that's obvious from the document itself. Who was the interpreter? The interpreter, I don't know the interpreter's name. The interpreter was... Troy or something like that. It wasn't Ms. Conner. It wasn't the interpreter who testified. The interpreter who interpreted for her when she filled this out was not the interpreter who interpreted at the trial. That person was not called as a witness. So you don't have any benefit... That might have been a useful witness one way or the other on how this got filled out the way it did. Well, Mr. Gray would have been a useful witness if he hadn't left the island. We didn't even know where he was. That's another story and that's not a matter of record, so I'm not really arguing that. Okay. I have nothing... Anything else, Mr. Trapp? No, except just to reiterate that she's charged with trying to trick the government into thinking she had entered on only two occasions, and the government's testimony from Agent Hernandez on page 44 of the excerpts of record says that that's exactly what happened. Thank you. All right. Thank you, Mr. Trapp. Ms. Johnson? Thank you, Your Honor. I only have 30 seconds left, so I think I will use it to thank you again for allowing us to appear to a video conference. I just want to say hello to two of my favorite lawyers. Thank you very much. Good to see you again. Yes, very good to see you again. All right. Thank you, counsel. The matter just argued will be submitted and the court will be in recess for the day.
judges: Goodwin, Rymer, Ikuta